## JOHN G. JOHNSON v. WILD RICE BOOM COMPANY.[1]

May 24, 1912.

Nos. 17,615—(170).

**Diversion of water — breach of contract.**

Upon a breach of a contract to refrain from diverting the water from a stream so as to interfere with the operation of a mill, used for manufacturing flour, the motive power of which is the water of the stream, the contractee may recover as damages profits which he would have made except for the breach.

**Evidence — damages.**

Evidence considered, and *held* that it is sufficient to sustain the verdict herein and the award of damages. The rulings of the trial court as to the admission of evidence were correct.

[1] Reported in 136 N. W. 262.

[Note]  Loss of profits as element of damages for obstruction of water way, see note in 52 L.R.A. 47.

Action in the district court for Norman county to recover $5,000 for diversion of the waters of Wild Rice river whereby plaintiff's mill could be operated only one-third of the time during the years 1908, 1909 and 1910. The case was tried before Grindeland, J., and a jury which returned a verdict in favor of plaintiff for $2,500. From an order denying defendant's motion for a new trial, it appealed. Affirmed.

*Lind, Ueland & Jerome,* for appellant.

*Christian G. Dosland* and *Peter Sharpe,* for respondent.

START, C. J.

The plaintiff brought this action in the district court of the county of Norman to recover damages for the alleged act of the defendant in diverting an excessive amount of water from plaintiff's mill in violation of its contract with the plaintiff. The answer admitted the execution of the contract, but denied the alleged breach thereof. The jury returned a verdict for the plaintiff for $2,500, and the defendant appealed from an order denying its motion for a new trial.

The assignments of error raise the question whether the trial court erred in its rulings as to the admission of evidence, whether it erred in refusing to instruct the jury to the effect that in no event could they return a verdict for the plaintiff for more than nominal damages, and whether the award of damages is sustained by the evidence.

The evidence on the trial, in connection with the admissions of the parties, tended to establish the facts following: The plaintiff for some sixteen years last past has been the owner of the southwest quarter of the southeast quarter of section 13, town 143, range 48, in the county of Norman. The Wild Rice river flows westerly through his land, upon which he has for many years owned and operated a flour and feed mill, using the waters of the river as a motive power therefor. The defendant owns and operates a sawmill at the city of Ada on the banks of Long lake, which with Lake Ada constitutes a watercourse which runs nearly parallel with

and near the Wild Rice river from a point some five miles east of Ada westerly to and through the city. There is no natural connection between such watercourse and Wild Rice river. The defendant's predecessor in interest, prior to the year 1904, in order to transport its logs from the river into the watercourse and thence to its sawmill, constructed and operated an artificial channel and sluiceway between the river and the lake.

The construction of this channel and the operation of the sluiceway diverted in some material degree the waters of the river from the plaintiff's mill, and he brought an action to restrain such diversion of the waters of the river. A settlement of the action was made, whereby the action was dismissed pursuant to the written stipulation of the parties made on October 27, 1904, in and by which satisfaction was to be made to the plaintiff for damages sustained prior thereto, and as to the future the agreement was this:

"The said defendant agrees not to divert any more of the water from the channel or river bed of the Wild Rice river but what it will leave sufficient quantity of water running in said river to enable said plaintiff to run and operate his flour mill.   *   *   * "

The defendant, in March, 1908, succeeded to all the rights and liabilities in the premises of its predecessor. The defendant did not observe the agreement as to diverting the waters of the river; on the contrary, from April, 1908, to April, 1911, when this action was commenced, the defendant, customarily, whenever its own business required it, kept the gates of the sluiceway opened so wide that the waters from the river were diverted from their natural channel in such quantities that the plaintiff was unable to operate his mill when the gates of the sluiceway were opened. The plaintiff repeatedly made protest to the defendant and requested that the gates be closed so that he could run his mill, which he had no trouble in doing when the gates were closed. The evidence was conflicting in material particulars, but it was sufficient to sustain a finding of the facts substantially as stated and the further fact that the defendant persistently failed to observe the terms of the stipulation on its part. It is then unquestionably liable for all damages resulting proximately from such breach of the stipulation. The serious

question, however, is whether the award of damages is fairly sustained by the evidence.

There was evidence relative to this question fairly 'tending to show that the plaintiff, when the natural flow of the water in the river was not interfered with by being diverted through the defendant's sluiceway, could run his mill eight to twelve hours a day. There was also evidence tending to show the capacity of the mill with the natural flow of the water and the approximate time between April, 1908, and April, 1911, during which the plaintiff was unable to run his mill by reason of the wrongful diversion of the water from the river by defendant, and further that he had sufficient wheat on hand at all times to keep his mill running if the water had not been diverted. He testified to the effect that the daily profits of his mill when in operation averaged some $17. It is the contention of the defendant that no proper foundation was shown for this statement as to the profits. The plaintiff in this connection testified as follows:

"Q. I mean, how do you figure it? That is, is your profit the same under all changing circumstances? A. No; they are not—that is why it varied from $14 to $20 per day. Q. What is your system of figuring profits? That is what I want to get at. Tell the jury how you arrive at that under these varying circumstances. A. Well, I take a test of one hundred fifty bushels and run that through and see how much flour I can make out of it, see how much shorts and how much bran I can make out of it, and then take the market price—what I sell shorts for, and bran for, and flour for—and figure that up and see what it amounts to, and then I figure my wheat at the day's price of the wheat that day, and then take the price of the wheat from the whole thing and I get the balance whenever I make a test that way. Q. And how often do you make those tests, as a rule? That is, how often did you make them during this time in controversy? A. I made them three or four times. Generally two times a year and especially when you start on new wheat. Q. From August 1, 1908, until August 1, 1909, how many of these tests did you make at various times? A. Two. Q. Now, between August 1, 1909, and August 1, 1910, how many of these tests did you make?

A. I made one. * * * Q. Do you remember if you made any during this time that I referred to? A. No; I didn't make any. My wheat was the same thing. Q. The conditions were the same as before? A. Yes. Q. Is that on account of the fact that you had the same wheat on hand there? A. Yes."

He further testified in detail as to the manner of making such tests and the results thereof, but not to making any others.

It is to be noted that the tests made by the plaintiff were during the time in controversy—that is, after the making of the stipulation and before the commencement of the action, which was during the period the water was at times diverted and the operation of the mill interrupted—and also that this is not a case for the recovery of anticipated or future profits, but one to recover only damages sustained in the past by the irregular flow of the stream due to the diversion of the water by the defendant in violation of its contract. The general rules, then, for ascertaining the amount of anticipated future profits lost by the interruption of an established business (see Goebel v. Hough, 26 Minn. 252, 2 N. W. 847) are not applicable in their entirety to a case like this one. Therefore it was not necessary for the plaintiff to show what his average profits from the operation of the mill were for a series of years before the diversion of the water from the stream, nor to deduct from the profits or earnings of the mill, which might have been made except for the diversion, anything for interest or maintenance of the plant, for in the last analysis the evidence as to the profits or earnings of the mill when it could be operated was to furnish a basis for ascertaining what damages the plaintiff sustained by the enforced temporary idleness of his mill.

No inflexible rule can be laid down for ascertaining the loss of profits in cases of this kind, for each case must be ruled in a large measure by its particular facts, but the evidence in every case must establish a reasonable basis for their allowance, which cannot rest on mere speculation. The general rule is that, upon the breach of a contract to refrain from diverting the water from a stream so as to interfere with the operation of a mill, used in manufacturing

flour, the motive power of which is the water of the stream, the contractee may recover as damages profits which he would have made except for the breach. Mississippi & Rum River Boom Co. v. Prince, 34 Minn. 71, 24 N. W. 344; Cargill v. Thompson, 57 Minn. 534, 59 N. W. 638; Ironton Land Co. v. Butchart, 73 Minn. 39, 49, 75 N. W. 749.

We have attentively considered the whole evidence in this case and reached the conclusion that it is sufficient to sustain the verdict and the award of damages. It follows that the court did not err in refusing to instruct the jury to the effect that the verdict could be only for nominal damages.

The defendant objected to any evidence being received, for the alleged reason that the complaint did not state a cause of action. The objection was overruled, and the ruling is here assigned as error. The ruling was correct, for obviously the complaint alleges a cause of action.

Several assignments of error challenge the rulings of the trial court in permitting the plaintiff to testify as an expert. The competency of a witness to give opinion evidence is a preliminary question for the trial judge and rests largely in his discretion, and his decision therein will not be reversed where there was any evidence tending to show competency. There were no reversible errors in any of the rulings as to the admission of evidence.

Order affirmed.